IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| CARLA A. WILLIAMS, | ) | |
|---|---|---|
| Plaintiff, | ) ) ) | |
| v. | ) ) | Case No. 13-CV-533-PJC |
| CAROLYN W. COLVIN, Acting Commissioner of the Social Security Administration, | ) ) ) ) ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Claimant, Carla A. Williams ("Williams"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying her applications for disability insurance benefits and supplemental security income benefits pursuant to the Social Security Act, 42 U.S.C. §§ 401 *et seq*. In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge. Any appeal of this order will be directly to the Tenth Circuit Court of Appeals. Williams appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that Williams was not disabled. For the reasons discussed below, the Court **REVERSES AND REMANDS** the Commissioner's decision.

1

**Claimant's Background**[1]

At the time of the hearing before the ALJ on October 21, 2011, Williams was 49 years old. (R. 29). She had an associate's degree and had worked as a graphic designer. (R. 31). Williams testified that she had an "emotional meltdown" at work in 2009 and took a four-month leave of absence. (R. 31, 33). She reported that her emotional problems stemmed from stress at work and the death of her 4-year-old son. (R. 31, 33-34). Williams sought therapy with a psychologist and was diagnosed with post-traumatic stress disorder ("PTSD"). (R. 31, 38). She thought that she had gotten better after her therapy, and she returned to work. (R. 33). Her difficulties continued after her return, and she resigned in December 2009 after a second leave of absence. *Id.* She said that she quit because she could not "deal with it anymore." *Id.*

Williams said that she worked as a sales associate at Dillard's Department store from March 11, 2011 through June 29, 2011. (R. 35). She said that she had looked forward to this job, because she had wanted to try something different. *Id.* She said that she enjoyed the work at Dillard's and liked the people. *Id.* Williams said that she experienced problems with crying spells at work and would have to leave. (R. 31, 35-36). She reported that she was frequently late to work and had missed 10 days in a three-month time period. (R. 35-36).

Williams reported that she felt like "giving up" and had thoughts of committing suicide. (R. 39). She reported that she was in process of getting a divorce, due to the effects of her emotional problems on her marriage. (R. 39). She testified that she had used alcohol in the past to self-medicate, but she had not had a drink in about six months. (R. 40-41). Williams started

---

[1] While Williams' claims included carpal tunnel syndrome, that physical issue does not appear to be part of her appeal to this Court, and therefore records relating to it are not referenced in this Opinion and Order.

outpatient treatment in January 2010 at Laureate Psychiatric Clinic and Hospital ("Laureate") for symptoms of depression. (R. 33-34). She was prescribed medications for her symptoms, and she found they were helpful. (R. 35). She said that she was not able to afford to continue her treatment at Laureate. (R. 34).

Williams reported that she used a sleep aid, but she continued to have difficulty sleeping due to nightmares associated with her son's death. (R. 36, 38-39). She typically got up around 10:30 a.m. and took a nap during the day. (R. 36, 37). Her usual daily meal was a bowl of Rocky Road ice cream and a cup of coffee. (R. 36). She reported that she occasionally went for a few days without bathing and generally wore a baseball cap, because she did not want to "deal" with her hair. (R. 37). On most days she wore her pajamas. *Id.* She visited with her friends regularly, gardened, and shopped for groceries. (R. 33, 38-39)

Records reflect that Williams was seen at Laureate for individual and group therapy from 2009 through 2011. (R. 239-74, 281-87). Williams saw Allen Gates, LPC, LMFT, for therapy at Laureate off and on from March 2010 through August 2011. (R. 244-50, 269-70, 281-87).

On October 30, 2009, Williams was seen by Mark D. Fossey, M.D., at Laureate for medication management to treat her depression and anxiety. (R. 185-87). Dr. Fossey's appointment note reflects that Williams had been in treatment for problems with depression and anxiety since 2008 and had recently started marital counseling. (R. 185). Williams told Dr. Fossey that she was having problems with mood swings, nightmares, difficulty sleeping, and sleeping too much. *Id.* She stated that she had a history of excessive alcohol use in the past, but had not had a drink since the fall of 2008. *Id.* Dr. Fossey stated Williams' primary Axis I[2]

---

[2] The multiaxial system "facilitates comprehensive and systematic evaluation." *See* American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 27 (Text Revision 4th ed. 2000) (hereinafter "DSM IV").

diagnosis as bipolar II disorder. (R. 187). He stated other Axis I diagnoses as PTSD; generalized anxiety disorder; attention deficit hyperactivity disorder ("ADHD"); and nicotine dependence. *Id.* He also included a note that he could not rule out alcohol dependence in sustained full remission. *Id.* Dr. Fossey assigned a Global Assessment of Functioning ("GAF")[3] of 55. *Id.*

Williams returned to Dr. Fossey on December 14, 2009. (R. 182). Adderall was helping with her concentration, organization, task completion, and distractability. *Id.* Dr. Fossey adjusted Williams' medications to help with sleep issues. *Id.* Dr. Fossey's progress notes from Williams' appointment on January 14, 2010, reflect that Williams continued to have some morning sedation from her medications. (R. 180). Dr. Fossey continued his prior diagnoses and adjusted Williams' medications. *Id.* On February 11, 2010,Williams said that she continued to experience periodic panic attacks and some morning sedation . (R. 178). Dr. Fossey increased Williams' diazepam and instructed her to take it if necessary during her panic attacks. *Id.*

Williams was seen for group therapy at Laureate on March 2, 2010. (R. 243). She reported problems with anxiety, panic attacks, and an inability to sleep. *Id.* She additionally said that her thoughts were negative, racing, and unfocused. *Id.* Progress notes reflect that Williams attended this group through April 13, 2010. (R. 239-44).

---

[3] The GAF score represents Axis V of a Multiaxial Assessment system. *See* DSM IV at 32-36. A GAF score is a subjective determination which represents the "clinician's judgment of the individual's overall level of functioning." *Id.* at 32. The GAF scale is from 1-100. A GAF score between 21-30 represents "behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment . . . or inability to function in almost all areas." *Id.* at 34. A score between 31-40 indicates "some impairment in reality testing or communication . . . or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." *Id.* A GAF score of 41-50 reflects "serious symptoms . . . or any serious impairment in social, occupational, or school functioning." *Id.*

At Williams' appointment with Dr. Fossey on March 3, 2010, she reported that she had increased symptoms of anxiety due to the upcoming anniversary of her son's death. (R. 176). Williams had ongoing complaints of difficulty sleeping. *Id.* Dr. Fossey adjusted Williams' medications. (R. 176-77).

Dr. Fossey signed a "To Whom It May Concern" letter dated March 3, 2010, stating that he had treated Williams since October 2009. (R. 171). Dr. Fossey wrote that Williams had been diagnosed with bipolar disorder, PTSD, and ADHD, and she had been compliant with her treatment. *Id.*

On March 11, 2010, and April 8, 2010, Williams continued to have sleep-related issues, and Dr. Fossey adjusted her medications. (R. 172-75). At Williams' appointment with Dr. Fossey on May 6, 2010, she said that she continued to have too much sedation in the morning. (R. 223). Dr. Fossey stated that Williams' condition was much improved, and she was stable on her current medications. (R. 224). He continued his previous diagnoses, and he assigned a GAF score of 70. *Id.* Williams continued to be doing well at a follow-up visit on June 24, 2010. (R. 220-21).

At Williams' appointment with Dr. Fossey on July 22, 2010, she reported that she continued to have a depressed mood and to experience infrequent panic attacks. (R. 217). Her interest, motivation, and energy remained "poor." *Id.* Dr. Fossey continued to state that Williams' condition was stable on current medications. (R. 218). He stated her primary diagnosis as other and unspecified bipolar disorder. *Id.* He stated her other Axis I diagnoses as generalized anxiety disorder, PTSD, and "[a]ttention deficit disorder without mention of hyperactivity." *Id.* Her current GAF was scored as 55. *Id.*

Williams returned to Dr. Fossey on August 24, 2010 and wanted to try a new medication for depression due to an increase in symptoms. (R. 214-16). She reported that her sleep was "OK," and Dr. Fossey described Williams' anxiety as "well controlled" on medications. (R. 214). Dr. Fossey adjusted her medications to address her depression. (R. 215). He assigned a GAF score of 55-60. *Id.*

On September 21, 2010, and October 19, 2010, Dr. Fossey adjusted Williams' medications. (R. 236-38). On November 17, 2010, Williams continued to experience "significant depression," and she had experienced two panic attacks since her last visit. (R. 233). Dr. Fossey prescribed Wellbutrin XL to treat her depression. (235). On December 15, 2010, Dr. Fossey adjusted Williams' medications. (R. 230-32).

At Williams' appointment with Dr. Fossey on January 12, 2011, she reported that she experienced some daytime panic attacks and continued PTSD symptoms. (R. 227). Dr. Fossey continued Williams' medications, and encouraged her to take an extra diazepam tablet if necessary to prevent panic attacks. (R. 229).

On February 15, 2011, Williams presented to Family & Children's Services explaining that she had received services at Laureate, but had lost her health insurance due to separation from her husband. (R. 275-78). Williams' diagnoses were bipolar II disorder, with a note to rule out PTSD and to rule out alcohol abuse. (R. 278). She was assessed a GAF score of 60. *Id.* She was prescribed several medications. *Id.*

The record contains a form entitled "Mental Residual Functional Capacity Assessment" signed by Gates dated August 29, 2011. (R. 288-90). Gates indicated on the form that Williams had marked limitations in nine of 20 categories, moderate limitations in nine categories, and no significant limitations in the remaining two categories. (R. 288-89). In his narrative comments,

Gates said that Williams continued to experience symptoms such as preoccupation with grief issues, difficulty with memory and focus, uncontrolled crying and outbursts, impaired ability to manage daily living skills, and decreased energy and interest in usual activities. (R. 290).

Williams presented to Dr. Fossey on September 14, 2011. (R. 294-96). She told Dr. Fossey that she began work at Dillard's in March, but resigned in June due to depressed mood, fatigue, frequent crying, and anxiety. (R. 294). She also said that she was unable to concentrate and to retain information that she needed to learn for the new position. *Id.* She was not able to afford all of her previous medications. *Id.* Dr. Fossey said that Williams continued "to have significant anxiety and depression which is interfering with her ability to work." (R. 295).

Agency consultant Ashley Gourd, M.D., performed a physical evaluation on May 20, 2010. (R. 188-90). Williams reported that her chief complaint was "mental." (R. 188). Williams told Dr. Gourd that she had last worked as graphic designer, but quit due to symptoms of depression. *Id.* Dr. Gourd diagnosed bipolar disorder. (R. 189). She noted that Williams was pleasant and cooperative, but did have a depressed affect. *Id.*

Agency consultant Beth Jeffries, Ph.D., completed a mental status examination on May 29, 2010. (R. 191-94). Williams' chief complaints were chronic depression and anxiety, PTSD, panic attacks, attention deficit disorder, and bipolar II disorder. (R. 191). Dr. Jeffries wrote that Williams became "irritable" during the concentration and memory portion of the evaluation. (R. 193). Dr. Jeffries noted that Williams' mood was steady and intense, and that her affect was tearful and cooperative. (R. 192). Dr. Jeffries found that Williams' alcohol dependence was affecting both her mood and her bereavement. (R. 193). Dr. Jeffries said that Williams' "symptoms of depression are impeding her ability to perform occupationally at this time." *Id.*

Dr. Jeffries' diagnoses were major depression, recurrent, moderate to severe; bereavement, complicated; and alcohol dependence. *Id.*

Nonexamining agency consultant Burnard Pearce, Ph.D., completed a Psychiatric Review Technique form and Mental Residual Functional Capacity Assessment dated June 23, 2010. (R. 195-212). On the Psychiatric Review Technique form, for Listing 12.04, Dr. Pearce indicated that Williams had depressive syndrome, marked by feelings of guilt or worthlessness. (R. 198). For Listing 12.06, Dr. Pearce found that Williams had an anxiety disorder, marked by recurrent and intrusive recollections of a traumatic experience, which was a source of marked distress. (R. 200). For Listing 12.09, Dr. Pearce noted alcohol dependence. (R. 203). For the "Paragraph B Criteria,"[4] Dr. Pearce said that Williams had moderate restriction of activities of daily living, mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace, with no episodes of decompensation. (R. 205). In the "Consultant's Notes" portion of the form, Dr. Pearce reviewed Williams' mental health and medication treatment history. (R. 207). Dr. Pearce summarized Dr. Jeffries' report in some detail, and he also summarized Williams' activities of daily living. *Id.* For his analysis of the evidence, Dr. Pearce stated that the Williams could "perform semi-skilled work." *Id.*

In Dr. Pearce's Mental Residual Functional Capacity Assessment, he found that Williams had moderate limitations in her ability to understand, carry out, and remember detailed

---

[4] There are broad categories known as the "Paragraph B Criteria" of the Listing of Impairments used to assess the severity of a mental impairment. The four categories are (1) restriction of activities of daily living, (2) difficulties in maintaining social functioning, (3) difficulties in maintaining concentration, persistence or pace, and (4) repeated episodes of decompensation, each of extended duration. Social Security Ruling ("SSR") 96-8p; 20 C.F.R. Part 404 Subpt P, App. 1 ("Listings") § 12.00C. *See also Carpenter v. Astrue*, 537 F.3d 1264, 1268-69 (10th Cir. 2008).

instructions, and in her ability to interact appropriately with the public. (R. 209-10). For his narrative assessment, he said that Williams could perform simple and some complex tasks, she could relate to others on a superficial work basis, and she could adapt to a work situation. (R. 211).

**Procedural History**

Williams filed an application on April 2, 2010, seeking disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq*. (R. 97-98). Williams alleged onset of disability on December 1, 2009. (R. 97). The application was denied initially and on reconsideration. (R. 51-55, 59-61). A hearing before ALJ Charles Headrick was held October 21, 2011. (R. 24-46). By decision dated December 23, 2011, the ALJ found that Williams was not disabled. (R. 9-19). On June 18, 2013, the Appeals Council denied review of the ALJ's findings. (R. 1-4). Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of this appeal. 20 C.F.R. § 404.981.

**Social Security Law and Standard of Review**

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability

claim. 20 C.F.R. § 404.1520.[5] *See also Wall v. Astrue*, 561 F.3d 1048, 1052-53 (10th Cir. 2009) (detailing steps). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Lax*, 489 F.3d at 1084 (citation and quotation omitted).

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Wall*, 561 F.3d at 1052 (quotations and citations omitted). Although the court will not reweigh the evidence, the court will "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Id.*

---

[5] Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510. Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c). If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied. At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings"). A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work. If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform. *See Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

**Decision of the Administrative Law Judge**

The ALJ found that Williams met insured status requirements through December 31, 2013. (R. 11). At Step One, the ALJ found that Williams had not engaged in any substantial gainful activity since her asserted onset date of December 1, 2009. *Id.* At Step Two, the ALJ found that Williams had severe impairments of depression, anxiety, and alcohol dependence. *Id.* At Step Three, the ALJ found that Williams' impairments did not meet a Listing. *Id.*

The ALJ determined that Williams had the RFC to perform work at all exertional levels, but with the following nonexertional limitations: "performing simple and some complex tasks, relate to others on a superficial work basis, and can adapt to a work situation." (R. 12). At Step Four, the ALJ found that Williams was not able to perform any past relevant work. (R. 18). At Step Five, the ALJ found that there were a significant number of jobs in the national economy that Williams could perform, taking into account her age, education, work experience, and RFC. *Id.* Therefore, the ALJ found that Williams was not disabled from December 1, 2009, through the date of his decision. (R. 19).

**Review**

All of Williams' arguments on appeal relate to the ALJ's consideration of the opinion evidence. The undersigned agrees with Williams that the ALJ erred by failing to explain what weight he gave the opinion evidence of Gates, the LPC therapist who had treated Williams at Laureate. Because the Court reverses due to this error, the other sub-issues raised by Williams relating to the opinion evidence are not discussed.

The ALJ here accurately recounted the opinion evidence reflected on the form completed by Gates. (R. 15). After this recitation, however, the ALJ made no other reference to that evidence, but he continued and completed a description of all of the opinion evidence. (R. 15-

11

16). He then discussed Williams' credibility. (R. 16-17). After the credibility discussion, the ALJ stated that the record did not contain any opinions from treating or non-treating physicians indicating that Williams had limitations greater than his RFC determination. (R. 17). He then went on to state that he gave great weight to the opinions of the agency consultants. (R. 17-18).

While Gates was an "other source" rather than an acceptable medical source, the ALJ was nevertheless required to explain the weight he gave the opinion evidence of Gates.

> Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.

Social Security Ruling 06-03p, 2006 WL 2329939 *6.

In a recent unpublished case, the Tenth Circuit explained that the Social Security Administration has directed ALJs to apply the same factors to opinion evidence from "other sources" as they apply to opinion evidence from acceptable medical sources. *Crowder v. Colvin*, 561 Fed. Appx. 740, 744-45 (10th Cir. 2014) (unpublished). In *Crowder*, the court reversed for additional consideration, even though the ALJ had discussed the opinion of the licensed clinical social worker and had given it some limited consideration. *Id. See also Carpenter*, 537 F.3d at 1267-68 ("The ALJ was not entitled to disregard the 'serious problems' set out in Dr. Ungerland's opinion simply because he is a chiropractor."); *Martinez v. Astrue*, 422 Fed. Appx. 719, 726-27 (10th Cir. 2011) (unpublished) (reversed in part so that the ALJ could use the relevant factors to analyze evidence from "other source").

Here, Gates had given therapy to Williams off and on from March 2010 through August 2011, and his opinions appear to be based on the observations he made during the therapy

sessions. (R. 244-50, 269-70, 281-90). Gates' opinions contained on the August 2011 form he completed appear to be buttressed by the statement of Dr. Fossey on September 14, 2011 that Williams continued "to have significant anxiety and depression which is interfering with her ability to work." (R. 295). There are also aspects of Gates' assessment that bear similarities to the report of agency consulting examiner Dr. Jeffries, including Dr. Jeffries' statement that Williams' "symptoms of depression are impeding her ability to perform occupationally at this time." (R. 193). Given the substantive nature of Gates' opinions regarding Williams' functional abilities, and their partial corroboration by acceptable medical sources such as Dr. Fossey and Dr. Jeffries, the ALJ was required to explicitly consider them using the applicable factors and to explain the weight he gave to those opinions. Williams' case must be remanded for the ALJ to make this more complete evaluation.

Because reversal is required due to the errors of the ALJ related to the opinion evidence of Gates, the undersigned does not address the remaining contentions of Williams. On remand, the Commissioner should ensure that any new decision sufficiently addresses all issues raised by Williams.

This Court takes no position on the merits of Williams' disability claim, and "[no] particular result" is ordered on remand. *Thompson v. Sullivan*, 987 F.2d 1482, 1492-93 (10th Cir. 1993). This case is remanded only to assure that the correct legal standards are invoked in reaching a decision based on the facts of the case. *Angel v. Barnhart*, 329 F.3d 1208, 1213-14 (10th Cir. 2003), *citing Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988).

## Conclusion

Based upon the foregoing, the Court **REVERSES AND REMANDS** the decision of the Commissioner denying disability benefits to Claimant for further proceedings consistent with this Order.

Dated this 3rd day of September, 2014.

_____
Paul J. Cleary
United States Magistrate Judge